UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

REPORT AND RECOMMENDATION

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Scott Nolan King,

        Plaintiff,

vs.

Lynn M. Dingle, individually,
and in her official capacity;
and Greg J. Lindell, Craig S.
Oseland, and Steve Hamann,
in their individual capacities;

        Defendants.        Civ. No. 08-5922 (ADM/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## I. Introduction

This matter came before the undersigned United States Magistrate Judge
pursuant to a general assignment, made in accordance with the provisions of Title 28
U.S.C. §636(b)(1)(B), upon the self-styled Motion of the Plaintiff Scott Nolan King
("King") for Relief Stated in Complaint, and the Defendants' Motion to Dismiss, or
for Summary Judgment. King appears pro se, and the Defendants appear by Margaret

E. Jacot, Assistant Minnesota Attorney General.  For reasons which follow, we recommend that the Defendants' Motion for Summary Judgment be granted, and that King's Motion for Relief State in Complaint be denied.

## II.  Factual Background

King is currently incarcerated at the Minnesota Correctional Facility, at Oak Park Heights ("MCF-OPH"), where he is serving a life sentence following a conviction for First Degree Murder.  See, State v. King, 513 N.W.2d 245, 245 (Minn. 1994); Affidavit of Lisa Rudeen, ("Rudeen Aff."), Docket No. 52, at ¶2 and Exhibit A.  At all relevant times, King was incarcerated at the Minnesota Correctional Facility, in Stillwater ("MCF-Stillwater").  See, Rudeen Aff. at ¶2.

King brings this action against Lynn Dingle ("Dingle"), who is the Warden of MCF-Stillwater, in her official and individual capacities, and against Craig Oseland ("Oseland"), Steven Hamann ("Hamann"), and Gregory Lindell ("Lindell"), in their individual capacities.  At all relevant times, Oseland, Hamann, and Lindell, were employees of MCF-Stillwater.  Construing King's submissions liberally, we understand him to be asserting claims, pursuant to Title 42 U.S.C. §1983, for asserted

violations of his rights under the First, Eighth, and Fourteenth Amendments.[1]  In addition, King alleges claims under Title 42 U.S.C. §§1985(3), and 1986, for a civil rights conspiracy, and for failure to prevent a civil rights conspiracy.  For relief, King seeks compensatory damages for his emotional injuries, punitive damages, and declaratory and injunctive relief pertaining to the disciplinary proceeding, including a request that we order an expungement of the pertinent incident from his prison records.  The facts, as pertinent to the Motions now before us, may be briefly summarized.

The Minnesota Department of Corrections' ("DOC's") correctional industry program is called MINNCOR, which provides a centralized organizational structure for the program.  See, Affidavit of Steven Hamann, ("Hamann Aff."), Docket No. 48,

---

[1]Although it is not clear if King is asserting an independent claim for retaliation under Section 1983, in addition to his claims related to a conspiracy to violate his First Amendment Rights, see, Plaintiff's Memorandum, Docket No. 34, at pp. 1-5, we have followed the Defendants' lead in proceeding as if he has also asserted such an independent claim.

Moreover, as the Defendants have noted, King has not specifically pled an Eighth Amendment claim but, in his Memorandum, he cites to Eighth Amendment law, so we have addressed whether he has asserted a viable Eighth Amendment claim and, for that purpose, assume that he has alleged such a claim.  We will further assume, but without deciding, that this particular claim is against the Defendants generally, although that is not entirely clear.

¶¶1, 5.  MINNCOR has a number of different shops at MCF-Stillwater.  Id. at ¶5.  In September and August of 2007, King was working in the W-Shop at MCF-Stillwater. Id. at ¶¶3 and 7, and Exhibit D.  W-Shop has three (3) production lines on which the inmates can work.  Id. at ¶5.  On one (1) production line, workers insert cards into bags, and seal the bags while, on the other two (2) lines, workers fold balloons, insert the balloons into bags, and seal the bags.  Id.  The cards and balloons do not go into the same bags, but each card bag must be accompanied by a balloon bag.  Id.  Card stuffing takes less time, however, so there are often more finished card bags than there are balloon bags, and accordingly, the foreman will move inmates around, between the production lines, in order to accommodate production needs.  Id.

In August and September of 2007, Stacy Corbo ("Corbo"),[2] who was, at that time, the Corrections Manufacturing Specialist for the W-Shop, and who was responsible for the direct supervision of the inmates who were working in the W-Shop, including King.  Id. at ¶3, and Exhibit A.  Corbo was hired by the DOC in 2001, to work as a Correctional Officer, and she began working for MINNCOR in 2005.  Id.

---

[2]Stacy Corbo was initially a Defendant in this action, but she has already been dismissed as a Defendant, upon the recommendation of the undersigned, by Order of the District Court, the Honorable Ann D. Montgomery presiding, which was dated July 22, 2009.  See, Order, Docket No. 24.

Hamann, who was the Factory Manager responsible for supervising MINNCOR's industry operations at MCF-Stillwater, avers that Corbo "directly supervised inmate workers, ensured that production ran smoothly, interviewed inmates for new employment positions, evaluated inmates, and granted raises." Id. at ¶1, 3; see also, Id. at Exhibit A.

According to Hamann, MINNCOR employees must comply with nearly all of the same training requirements as DOC security staff, and they are expected to follow DOC policies. Id. at ¶4. DOC employees must attend academy training, prior to the commencement of their employment, which lasts about three (3) weeks, and they are required to complete additional mandatory training throughout each year of employment. Id. As pertinent here, the employees learn the rules regarding interaction with other inmates, the protection of inmates' rights, the protection of the safety and security of both inmates and staff, and the protection of data privacy. Id. at ¶4, and Exhibit B.

King was initially assigned to the card stuffing production line in the W-Shop. Id. at Exhibit F. Apparently, on August 31, 2007, Corbo reassigned King from the card stuffing production line to the balloon stuffing line, which King believed was a demotion. Id. at ¶10, and Exhibit F. Shortly thereafter, on September 5, 2007,

Hamann was filling in for Corbo's supervisor, Tom Petrich, who was on vacation, when Hamann was approached by King while Hamann was making the rounds in the W-Shop.  <u>Id.</u> at ¶10.  King told Hamann that he had been unfairly demoted from his position, as Lead Worker for the card stuffing line.  <u>Id.</u>  Hamann discussed the situation with King, and then told King to put his complaints in writing, and send them to him.  <u>Id.</u>  The next day, on September 6, 2007, King sent Hamann a kite, which King had entitled "Grievance/Complaint."[3]  <u>Id.</u> at Exhibit F.  Notwithstanding the title, Hamann avers that the kite was not a formal grievance, as defined by the DOC grievance procedure.  <u>Id.</u> at ¶10.

In his kite, King alleged that Corbo demoted him from his Lead Worker position on the card stuffing line, because King had not informed her about workers, who had not come to work during the last week of August, which resulted in a drop in the production of cards.  <u>Id.</u> at Exhibit F.  King further alleged that his job duties did not include monitoring the attendance of his co-workers, or reporting that attendance to Corbo.  <u>Id.</u>  King, who is an African-American male, further alleges that

---

[3]A "kite" is "a printed form issued by the [DOC] that offenders use to communicate with staff * * * [and that] can be used to request appointments, information, programming, or to informally resolve an issue."  See, <u>Affadivit of Kim Ebeling, Docket No. 47</u>, at Exhibit A ("Grievance Procedure").

Corbo gave his Lead Worker position to a white man, and that her decision to reassign him was racially motivated.  Id.  King requested reinstatement to his Lead Worker position, and a statement assuring that the incident would not affect King's eligibility for pay raises in the future.  Id.  Hamann avers that, when he spoke with King on September 5, 2007, King had not mentioned racial discrimination.  Id. at ¶10.

According to Hamann, there is no formal Lead Worker position, because no inmates are allowed to supervise other inmates.  Id.  ¶7.  Hamann avers that, while there is no formal position, some inmate workers become informally known as Lead Workers because they demonstrate that they are responsible, experienced workers, who the staff are able to rely upon for information about production.  Id.  Hamann attests that inmate workers are reviewed quarterly for raises, which are based upon seniority, performance, and the pay rates of other workers in the shop.  Id. at ¶8.  In addition, inmate pay rates fall into various categories, and there are caps on the number of inmates in a shop, who may receive wage rates within each category.  Id.  According to Hamann, while taking on more responsibility as a Lead Worker would increase an inmate's chances that they would receive a favorable evaluation, it does not affect the factors that are considered in granting raises.  Id. at  ¶8, and Exhibit E.  Hamann avers that, as a result, Corbo's decision to move King to another production

line did not result in a demotion, a change in his employment position, or a decrease in pay.  Id. at ¶10.

After receiving King's kite, Hamann gave a copy of the kite to Corbo, and asked her to meet with him in his office in order to discuss the kite after she had reviewed it.  Id. at ¶11.  Corbo went to Hamann's office later in that same day, at which time, they discussed King's allegations.  Id.  Corbo denied the allegations and stated that she moved King to a different line, because more workers were needed in other production lines.  Id.  During that conversation, Corbo stated that she had left King's kite lying on her desk in the W-Shop office, and that the inmate worker who performed janitorial work in the W-Shop might have seen the kite through the windows.  Id. at ¶12.  In response, Hamann told Corbo that she needed to be more careful in maintaining the privacy of inmate's kites, and that she should tell inmate workers to stay at least five (5) feet away from the office so that they could not see items on her desk.[4]  Id.  Hamann avers that Corbo did not tell him that she had

---

[4]The Defendants have submitted photographs of the W-Shop office, which reveal that it is a small enclosed office, with windows on three (3) sides.  See, Hamann Aff., supra at Exhibit C.  Hamann avers that an inmate outside of the office would be able to see paperwork that was on the desk in the office, if he was close to the windows and looking inside.  Id. at ¶6.

intentionally shown, or discussed,  the contents of King's kite with another inmate.

Id.

Following that conversation, on September 7, 2007, Hamann sent King a memorandum in response to his kite.  Id. at ¶11 and Exhibit G.  In pertinent part, Hamann's memorandum stated as follows:

> You * * * mentioned that you were demoted from the card stuffing area, as you claim that you were a "lead worker." It is the discretion of the foremen to determine who works in specific area's [sic] as anybody can be put into a different position to provide other services in the Anagram division as the foremen see fit.
>
> I have moved many individuals to other area's [sic] when I have been involved with the day to day operations of Anagram.  During our conversation, I asked you to send me a kite, which you have done, to express specific issues related to your change of duties.  In your kite, you are claiming racial discrimination.
>
> Mr. King, the changing of your duties are [sic] in no way racially motivated.  As I stated before, the foremen can and will continue to determine who works where to benefit the production of Anagram product.
>
> You are not responsible for the lack of attendance by other workers as you are claiming that this responsibility is a reason as to why your duties were changed.  I will mention that past practice has been that foremen are notified by offenders if their area is in need of more offender support to meet daily goals.

> Based on some of the issues that had taken place with your former duties, could [sic] indeed affect you with not getting a raise. You do have the right to apply or bid out for other positions if Anagram is not a good fit for you.

Id. at Exhibit G.

For his part, King avers that, on September 6, 2007, after Corbo received a copy of King's kite from Hamann, he and several other inmates saw her call Calvin Jones ("Jones"), who is another inmate worker in the W-Shop, into her office, and give him a copy of the grievance to read.[5] See, Affidavit of Scott Nolan King, ("King Aff."), Exhibit C3 to Complaint, Docket No. 2, ¶¶6-7. King alleges that, after Jones left Corbo's office, King talked with Corbo, and stressed that showing his kite to Jones was against prison policy, but that she was unresponsive. See, Complaint, supra at ¶9.

King further alleges that, on September 6, 2007, he also "personally informed Hamann that Corbo showed Prisoner Jones the grievance to read," and then asked

---

[5]Hamann avers that there is one (1) inmate worker assigned to be a clerk in the W-Shop, whose job entails obtaining information from production lines, writing information on a board, and verifying orders before they are shipped out. See, Hamann Aff., supra at ¶6. The inmates who are working on the production line provide production information to the clerk, who then completes the associated paperwork. Id. According to Hamann, the clerk often enters the W-Shop office in order to complete paperwork with the foreman, but the clerk is never allowed in the W-Shop unaccompanied by a staff person. Id. Hamann avers that Jones has worked as the W-Shop clerk in the past, but he does not know if he was working as the clerk in August or September of 2007. Id.

Hamann if he was going to talk to Corbo, because King was concerned "that there could be problems from Prisoner Jones." Id. at ¶10. King claims that Hamann was unresponsive. Id. Hamann avers that he does not recall having any further conversations with King about his allegations, after sending his responsive memorandum to King. Hamann Aff., supra at ¶13.

King further alleges that, on September 10, 2007, another inmate told King that Jones and Corbo had discussed his kite, in which he accused Corbo of racial discrimination, and that they had together concluded that Jones was going "to take care of [King] for filing the grievance." Complaint, supra at ¶12. King further alleges that, between September 10, 2007, and September 17, 2007, several other inmates told him to be "aware" of Jones. Id. at ¶13.

Shortly thereafter, on September 19, 2007, Jones reported to MCF-Stillwater staff that he had been assaulted during recreation in Cell Hall B East. See, Affidavit of Gregory Lindell, ("Lindell Aff."), Docket No. 50, ¶4. Following that assault, Jones approached staff while he was bleeding profusely from the neck, at which time, they placed him in a wheelchair, and escorted him to health services for treatment. Id. at ¶4, and Exhibit E. Jones "sustained a neck wound of approximately 1 inch in length which was closed by sutures." Id. Sergeant Paul Hofland ("Hofland") watched video

footage, from a surveillance camera in Cell Hall B East, and he determined that King

was Jones' assailant.  Lindell Aff., supra at ¶4 and Exhibits C and D.[6]  Hofland

described the incident, as follows:

> I watched cell hall video to find how Offender Jones received a puncture wound to the right side of his neck. * * * King met up with Offender Jones near the B-East bubble. Both offenders walked together toward the B-East door. They square off and face each other near cell 141. Offender King hit offender Jones with his left hand to Jones's right side of his neck area.  Offender Jones then hits King with his right hand to the neck upper chest area. Offender Jones then backed up as Offender King walked at Offender Jones.  Offender Jones has his hands up in a defensive stance as he is backing up.  King turned and walked away toward the door as Offender Jones follows. Offender King then stoped [sic] and faces Jones again and they both stop and square off again but no punches are thrown.  Offender King then turned and walked toward the door and Jones again walked after him for approximately 4 cells and then turned and walked away.  Offender King then talked to [another Offender] and then King backed up to the trash can with both hands behind his back and then walked to his cell * * *.  All Offenders listed above worked in W-Shop.

Id. at Exhibit D.

---

[6]A copy of the surveillance footage of the incident between Jones and King has been provided to the Court.  See, Lindell Aff. at Exhibit C.  We have reviewed the surveillance footage, which reveals that King initiated the physical altercation, consistent with the reports of the prison officials in the Record.

Following the incident, on September 19, 2007, the Office of Special Investigations ("OSI") at MCF-Stillwater launched an investigation into the altercation between Jones and King, in order to determine whether the case should be referred to the Washington County Attorney's Office for criminal prosecution. See, <u>Affidavit of David Kampa, ("Kampa Aff."), Docket No. 49</u>, at ¶¶1-2.

David Kampa ("Kampa"), who is an investigator with OSI, was involved in that investigation and, on September 20, 2007, he interviewed King. <u>Id.</u> at ¶¶1-3. As related by Kampa, King told him that Corbo had shown Jones a kite that he had written, and that he had preemptively assaulted Jones, because he was afraid that Jones would assault him based upon the information contained in his kite. <u>Id.</u> at ¶3.

Lieutenant Prince Aileru ("Aileru"), who was in charge of Cell Hall B East at MCF-Stillwater at all times relevant, avers that, prior to the altercation between the two (2) inmates, King never told him that he believed Jones was going to assault him, or that he had been threatened by Jones. See, <u>Affidavit of Prince Aileru, ("Aileru Aff."), Docket No. 46</u>, at ¶¶1-2. Aileru attests that had he been aware of King's allegations, he would have placed King on Investigative Restrictive Status ("IR Status"), would have investigated King's allegations, and would have referred the matter to MCF-Stillwater's Incompatibility Review Committee ("Committee"). <u>Id.</u>

at ¶2.  An inmate is locked in his cell, for safety, while on IR Status.  <u>Id.</u>  Following a referral, the Committee investigates and determines whether offenders should be assigned an incompatibility, where an inmate has complained of a conflict with another inmate.  <u>Id.</u> at ¶3; see also, Exhibit A.  According to Aileru, the Committee will assign an incompatibility if there is compelling evidence, which indicates a risk of serious bodily injury if the inmates are not separated.  <u>Id.</u>  An incompatibility requires the inmates to be assigned to different DOC facilities.  <u>Id.</u>

Prior to the assault of September 19, 2007, OSI also did not have any records regarding any problems, or issues, between Jones and King, and its investigations, which followed the assault, did not reveal that King had informed any MCF-Stillwater staff that he feared an assault at any time prior to the investigation of the incident.  See, <u>Kampa Aff.</u>, supra at ¶4.  In addition, Hamann avers that he is certain that King never told him that he believed Corbo, and Jones, were conspiring to assault him, that he feared Jones would assault him, or that Corbo had deliberately shown King's kite to Jones.  See, <u>Hamann Aff.</u>, supra at ¶13.  Hamann avers that the first time, that he learned of any of King's allegations as to Corbo and Jones, was through rumors following the altercation between Jones and King, and then, more fully, when OSI contacted him in regard to its investigation.  <u>Id.</u>  According to Hamann, had King

informed him that Jones had threatened to assault him, Hamann would have taken steps to ensure King's safety, by referring the matter to security personnel at MCF-Stillwater. Id. at ¶9.

Hamann further avers that he was surprised to learn that Corbo had breached DOC policy, since she had been a good employee up until that time. Id. at ¶14. According to Hamann, Corbo did not have a prior disciplinary record, and there was nothing in her record which would indicate that she would engage in prohibited conduct. Id. Hamann avers that DOC staff do not show kites to other inmates because it violates their rights, and can threaten the safety and security of the facility, can cause embarrassment, and can cause conflict between inmates. Id. at ¶15, and Exhibit H. Hamann attests to the fact that Corbo was thoroughly trained on those policies, and should have known that it was a violation to show King's kite to Jones. Id. at ¶15. Hamann avers that MINNCOR does not tolerate this type of conduct, as evidenced by its termination of Corbo, following the investigation into the incident between Jones and King. Id.

Based upon the information gained during its investigation, which included physical evidence, video footage, photographs, incident reports, medical records, and the interviews of the witnesses, OSI concluded that the evidence established that King

had assaulted Jones, and the case was referred to the Washington County Attorney's Office for prosecution.  <u>Kampa Aff.</u>, supra at ¶2.  However, it appears that those charges were eventually dismissed.  See, <u>Exhibit X30 to Complaint, Docket No. 2</u>.

Following the interview with King, Kampa and Jeff Dansky ("Dansky"), who is another OSI investigator, interviewed several inmates, and MINNCOR staff, concerning King's allegations.  <u>Kampa Aff.</u>, supra at ¶3.  One of the interviews was with Corbo, since it is considered employee misconduct to show one (1) inmate another inmate's kite.  <u>Id.</u>  According to Kampa, Corbo initially denied King's allegations, but eventually, she admitted that the had discussed King's kite and its contents with Jones.  <u>Id.</u>  Following that interview, OSI prepared and submitted a report to Lynn Dingle ("Dingle"), who was the Warden of MCF-Stillwater, and the report was referred to a Work Incident Review Committee, which determined that Corbo had violated several DOC policies by sharing King's kite with Jones.  <u>Id.</u> Corbo was terminated from her employment on November 13, 2007.  <u>Id.</u> at ¶3 and Exhibit A.

As a result of the altercation between Jones and King, Lindell, who is a corrections lieutenant in the discipline unit at MCF-Stillwater, charged King with violating several Offender Discipline Regulations ("ODRs").  <u>Lindell Aff.</u>, supra at

¶5. ODRs "apply to inmates at DOC facilities and inform offenders of what conduct is prohibited and what the penalties are for infractions." Id. at ¶3 and Exhibit B.

A Notice of Violation Report was delivered to King on September 24, 2007, which notified him of the factual basis for the charges, and the evidence to be introduced at the Hearing. Id. at ¶5 and Exhibit F. The Notice of Violation charged King with Destruction, Damage, or Alteration of Property, in violation of ODR 270; Disorderly Conduct in violation of ODR 320; Possession of Contraband -- Weapons, in violation of ODR 383; Assault on an Inmate with a Weapon, in violation of ODR 414; and Attempted Homicide, in violation of ODR 440. Id. at Exhibit F. Lindell attests that, although he was aware that King alleged that he had preemptively assaulted Jones, because of an asserted conspiracy between Jones and Corbo, he found that the evidence clearly showed that King initiated the altercation with Jones. Id. at ¶7. Accordingly, Lindell avers that King's conduct was in violation of the ODRs, and that the violations would have been charged against King, regardless of King's motivations for committing the violations. Id. Lindell attests that he did not become aware of any alleged conspiracy, or of King's belief that Jones was conspiring to assault him, prior to the OSI investigation. Id. He further avers that he was not aware of King's belief, that Jones and Corbo were conspiring against him. Id.

King was also provided with a Notice of Hearing Date, which disclosed that the Hearing, with respect to the ODR charges against him, would be held on October 2, 2007, and he requested a continuance of that Hearing date, which he was granted, and the Hearing was rescheduled for November 2, 2007. Id. at ¶5 and Exhibit G. T h e Hearing was held on November 2, 2007, and was presided over by Oseland, who is a Corrections Case Manager at MCF-Stillwater, and who was working out of class, as a Hearing Officer at MCF-Stillwater, at all relevant times. See, Affidavit of Craig Oseland, ("Oseland Aff."), Docket No. 51, at ¶¶1-2. Oseland attests that, at the Hearing, the prosecution presented testimony, incident reports, cell hall videos, notes, and photographs, from the investigation conducted by OSI, as well as physical evidence that was collected at the scene of the assault. Id. at ¶2.

Oseland avers that, in his defense, King testified that Jones had threatened him, and that he had assaulted Jones in order to prevent Jones from assaulting him. Id. After reviewing all of the evidence, Oseland determined that King had assaulted Jones, and used the key to his cell as a weapon. Id. Accordingly, Oseland concluded that King had violated ODR 320, ODR 383, and ODR 414, but he found that King did

not have the intent to murder Jones, so he dismissed charge under ODR 440.[7] Id. at ¶2, and Exhibit H. In his findings, Oseland stated that "the penalty is mitigated for reasons of self defense," and that he believed that "the intent was not to cause bodily harm, or to murder the offender." Id. at ¶3.

Oseland attests that, when he used the term "self defense" in his findings, he was not using the phrase as it is used in the Criminal Law. Id. at ¶3. Rather, he avers that he used the term so as to "recognize King's motivation for committing the assault," and that it was still his conclusion that King had started the fight. Id. Oseland avers that, "[a]lthough King believed he was acting in self defense, he still engaged in an unprecipitated assault of another inmate * * * [and] [r]egardless of his motivation, King was guilty of the assault because the evidence clearly established that he started the fight with Jones, punched Jones, and injured Jones." Id. Accordingly, Lindell imposed a ninety (90) day segregation sentence for disorderly conduct; a ninety (90) day segregation sentence for possessing a weapon; and an one hundred and eighty (180) day segregation sentence for the assault. Lindell Aff., supra at Exhibit I. The sentences were to run concurrently. Id.

_____

[7]The charge that King had violated ODR 270 ("Destruction Damage, or Alteration of Property") was withdrawn prior to the Hearing. See, Oseland Aff., supra at ¶2.

King alleges that he was denied the right to present witnesses at the disciplinary Hearing.  According to King, he requested that Corbo, and another inmate, testify at the Hearing.  Oseland Aff., supra at ¶4 and Exhibit A.  Although Oseland acknowledged that King's requested witnesses were not at the Hearing, he does not recall the reason that the witnesses were not present.  Id. at ¶4.  However, Oseland avers that the DOC does not compel witnesses to testify, so if they did not wish to testify, they need not appear at a Hearing.  Id.  Oseland further avers that an inmate must complete the witness request form, within a designated time limit, in order for the requested witness's testimony to be permitted at the Hearing.  Id.  King's witness request form is not dated, and does not contain the initials of a Discipline Unit staff person which, according to Oseland, indicates that the form may not have been turned in, or may have turned in after the deadline.  Id.

DOC policy provides that an inmate, who is subject to the disciplinary process, has the right to appear in person, and be heard by an impartial Hearing Officer, who is not to be the reporting officer, a witness, or anyone who will review the proceedings if the inmate appeals.  See, Lindell Aff., supra at Exhibit B.  Oseland recognizes that he was working "out of class" as a Hearing Officer at the time of the Hearing. Oseland Aff., supra at ¶5.  As related by Oseland, employees of the DOC are assigned

to different job classes, which have specific job descriptions and duties, and that he was assigned to the job class of Corrections Case Manager.  Id.  He further relates that an employee, who is regularly assigned to a class, can be assigned to temporarily work another position -- or "out of class" -- when necessary.  Id. at ¶5, and Exhibit B. When working out of class, the employee "has all the powers, duties and responsibilities of the position he is filling."  Id.  As such, Oseland avers that, for purposes of the DOC offender discipline policy, he was considered to be a Hearing Officer.  Id.

On August 20, 2009, King filed a self-styled "Dispositive Motion," which we construe as a Motion for Summary Judgment, in which he moves the Court for an Order finding that the Defendants "knowingly and intentionally deprived [him] of his rights under Federal Law * * * [and that he] be granted the requested relief in his complaint."  See, Plaintiff's Dispositive Motion, Docket No. 32.  King asserts that the evidence "explicitly supports" that his rights, under Federal Law, were intentionally violated by the Defendants.  Id.

Thereafter, on October 28, 2009, the Defendants filed a Motion to Dismiss, and for Summary Judgment.  See, Defendants' Motion to Dismiss and for Summary Judgment, Docket No. 44.  First, Dingle argues that King's claim for damages against

her, in her official capacity pursuant to Title 42 U.S.C. §1983, are barred by the Eleventh Amendment. See, <u>Defendants' Memorandum in Support, ("Defendants' Memorandum"), Docket No. 45</u>, at pp. 1, 10-11. Second, the Defendants argue that King's claims must be dismissed, because he failed to exhaust his administrative remedies, with respect to the claims that are raised in his Complaint. <u>Id.</u> at pp. 8-9. The Defendants further argue that they are entitled to Summary Judgment because they did not violate King's Federal constitutional, or statutory rights and, in any event, that they are protected by qualified immunity. <u>Id.</u> at p. 1. We address the parties' arguments in turn.

## III. <u>Discussion</u>

A.  <u>Standard of Review</u>. Rule 12(c), Federal Rules of Civil Procedure, allows parties to move for a Judgment on the Pleadings, "[a]fter the pleadings are closed -- but early enough not to delay trial." The standard upon which Rule 12(c) Motions are decided is akin to that of a Motion to Dismiss under Rule 12(b)(6), Federal Rules of Civil Procedure. See, <u>Westcott v. City of Omaha</u>, 901 F.2d 1486, 1488 (8th Cir. 1990) ("[W]e review this 12(c) motion under the standard that governs 12(b)(6) motions."), citing <u>St. Paul Ramsey County Med. Ctr. v. Pennington County</u>, 857 F.2d 1185, 1187 (8th Cir. 1988); see also, <u>Flora v. Firepond, Inc.</u>, 260 F. Supp. 2d

780, 784 (D. Minn. 2003), aff'd, 383 F.3d 745 (8th Cir. 2004). As a result, a "[j]udgment on the pleadings is appropriate where no material issue of fact remains to be resolved and the movant is entitled to judgment as a matter of law." Faibisch v. University of Minnesota, 304 F.3d 797, 803 (8th Cir. 2004), citing United States v. Any & All Radio Station Transmission Equip., 207 F.3d 458, 462 (8th Cir. 2000), cert. denied, 531 U.S. 1071 (2001). A disputed fact is "material," if it must inevitably be resolved, and that resolution will determine the outcome of the case. See, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Jenkins v. Southern Farm Bureau Casualty, 307 F.3d 741, 744 (8th Cir. 2002)("A fact is material if its determination in favor of the non-moving party could affect the result in the case."); Herring v. Canada Life Assurance Co., 207 F.3d 1026 (8th Cir. 2000).

When making such determinations, "[w]e accept as true, all facts pleaded by the non-moving party and grant all reasonable inferences from the pleadings in favor of the non-moving party." Syverson v. Firepond, Inc., 383 F.3d 745, 749 (8th Cir. 2004), quoting United States v. Any & All Radio Station Transmission Equip., supra at 462. However, we need not accept as true, wholly conclusory allegations, or unwarranted factual inferences. See, Hanten v. School Dist. of Riverview Gardens, 183 F.3d 799, 805 (8th Cir. 1999). Moreover, in treating the factual allegations of a Complaint as

true, the Court "do[es] not, however, blindly accept the legal conclusions drawn by the pleader from the facts." Westcott v. City of Omaha, supra at 1488, citing Morgan v. Church's Fried Chicken, 829 F.2d 10, 12 (6th Cir. 1987).

In addition, Summary Judgment is not an acceptable means of resolving triable issues, nor is it a disfavored procedural shortcut when there are no issues which require the unique proficiencies of a Jury in weighing the evidence, and in rendering credibility determinations. See, Wallace v. DTG Operations, Inc., 442 F.3d 1112, 1118 (8th Cir. 2006), citing Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986); Midwest Oilseeds, Inc. v. Limagrain Genetics Corp., 387 F.3d 705, 711 (8th Cir. 2004), cert. denied, 544 U.S. 977 (2005). Summary Judgment is appropriate when we have viewed the facts, and the inferences drawn from those facts, in a light most favorable to the nonmoving party, and we have found no triable issue. See, Smutka v. City of Hutchinson, 451 F.3d 522, 526 (8th Cir. 2006), citing Mayer v. Nextel W. Corp., 318 F.3d 803, 806 (8th Cir. 2003), cert. denied, 540 U.S. 823 (2003); Eide v. Grey Fox Technical Servs. Corp., 329 F.3d 600, 604 (8th Cir. 2003); Philip v. Ford Motor Co., 328 F.3d 1020, 1023 (8th Cir. 2003).

For these purposes, a disputed fact is "material" if it must inevitably be resolved and the resolution will determine the outcome of the case, while a dispute is "genuine"

if the evidence is such that a reasonable Jury could return a Verdict for the nonmoving party. See, <u>Anderson v. Liberty Lobby, Inc.</u>, supra at 248; <u>Planned Parenthood of Minnesota/South Dakota v. Rounds</u>, 372 F.3d 969, 972 (8th Cir. 2004); <u>Fenney v. Dakota, Minnesota & Eastern R.R. Co.</u>, 327 F.3d 707, 711 (8th Cir. 2003).

As Rule 56(e) makes clear, once the moving party files a properly supported Motion, the burden shifts to the nonmoving party to demonstrate the existence of a genuine dispute. In sustaining that burden, "an opposing party may not rely merely on allegations or denials in its own pleading; rather, it response must -- by affidavits or as otherwise provided in this rule -- set out specific facts showing a genuine issue for trial." <u>Rule 56(e), Federal Rules of Civil Procedure</u>; see also, <u>Anderson v. Liberty Lobby, Inc.</u>, supra at 256; <u>Eddings v. City of Hot Springs, Ark.</u>, 323 F.3d 596, 602 (8th Cir. 2003).

Moreover, the movant is entitled to Summary Judgment where the nonmoving party has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex Corp. v. Catrett</u>, supra at 322; see also, <u>Forest Park II v. Hadley</u>, 408 F.3d 1052, 1057 (8th Cir. 2005); <u>Mercer v. City of Cedar Rapids</u>, 308 F.3d 840, 843 (8th Cir. 2002); <u>Hammond v. Northland Counseling Center</u>, Inc., 218 F.3d 886, 891 (8th Cir. 2000). No genuine

issue of fact exists in such a case because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, supra at 323; see also, Sallis v. University of Minnesota, 408 F.3d 470, 474 (8th Cir. 2005); Davis v. U.S. Bancorp, 383 F.3d 761, 768 (8th Cir. 2004); Bell Lumber and Pole Co. v. United States Fire Ins. Co., 60 F.3d 437, 441 (8th Cir. 1995).

B.    Legal Analysis. As a threshold question, the Defendants seek Summary Judgment on King's claims, under the First and Eighth Amendments, and under Section 1986, because King has failed to exhaust his administrative remedies, and accordingly, our analysis commences with that contention.

1.    Exhaustion of Administrative Remedies.

a.    Standard of Review. In Jones v. Bock, 549 U.S. 199 (2007), the Supreme Court recently considered the role that a prisoner's failure to exhaust his administrative remedies should play in the context of deciding the merits of a claim, which is brought pursuant to Section 1983. The Court began its analysis by noting that requiring prisoners to exhaust their administrative remedies had the positive effect of allowing prison officials "an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court," which, in turn, "has

the potential to reduce the number of inmate suits, and also to improve the quality of suits that are filed by producing a useful administrative record." Id. at 204, citing Woodford v. Ngo, 548 U.S. 81, 94-95 (2006).

Those purposes served as the backdrop to the Court's consideration of the exhaustion requirement, that Congress included in the Prison Litigation Reform Act ("PLRA"), which provides as follows:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

Title 42 U.S.C. §1997e(a).

The Court first considered whether exhaustion, which is "mandatory under the PLRA," is a pleading requirement that must be satisfied by the prisoner in his Complaint, or if it must be pled, and proved, by the defendant. See, Jones v. Bock, supra at 211, citing Porter v. Nussle, 534 U.S. 516, 524 (2002). After noting that the drafters of the PLRA failed to impose a stringent pleading requirement on prisoners, the Court concluded that the "failure to exhaust is an affirmative defense under the PLRA, and that inmates are not required to specially plead or demonstrate exhaustion in their complaints." Id. at 216. The Court further clarified that Courts, which are charged with determining exhaustion, should do so on a case-by-case basis, with each

prisoner's Complaint being evaluated in the light of its compliance with established prison grievance procedures.  Id. at 218.

The Court concluded by considering "mixed claims," in which a prisoner has failed to exhaust some, but not all, of the claims asserted in his or her Complaint.  In general, "if a complaint contains both good and bad claims, the court proceeds with the good and leaves the bad," and the Court distinguished the exception to this general rule -- the total exhaustion requirement in habeas corpus -- because of the implication that habeas relief has on principles of comity and federalism.  Id. at 221-222.  The Court concluded that the language in Section 1997e(a) of the PLRA, which states that "[n]o action shall be brought" unless administrative procedures are exhausted, allowed Courts to follow the typical claim-by-claim approach, and precluded blanket dismissal of a prisoner's Complaint that contained both exhausted and unexhausted claims.  Id.

      b.    Legal Analysis.  As noted, the Defendants contend that King has not exhausted his administrative remedies, with respect to his claims under the First Amendment, Eighth Amendment, and Section 1986.

In support of their contention, the Defendants have provided copies of the DOC's Grievance Procedures, which were in effect at all times relevant to the pending action.  See, Affidavit of Kim Ebeling ("Ebeling Aff."), Docket No. 47, at ¶2 and

Exhibit A.  Before the filing of a formal grievance, an inmate "must attempt to resolve any concerns informally via the kite system prior to pursuing the formal grievance process * * * [and] must follow the chain of command and contact only one staff at a time."  Id.  The Grievance Procedure explicitly provides that "[a]n offender may, in good faith, submit a grievance without fear of retaliation."  Id. at Exhibit A.

The DOC's formal grievance procedure has two (2) levels.  Id. at ¶2.  First, an inmate must file a grievance with the correctional facility's grievance coordinator, and either the Warden of the facility, or a designee, will decide the grievance.  Id.  If the inmate is dissatisfied with the facility's decision, then he may initiate a grievance appeal, which will be decided by either the Commissioner of Corrections, the Assistant Commissioner of Corrections, or the Deputy Commissioner of Corrections.  Id.  The decision on appeal is considered the DOC's final response to the inmate's grievance.  Id.  In the event that the inmate fears retaliation at the facility where he is incarcerated, a grievance may be filed directly with the DOC's Central Office.  Id.

Kim Ebeling ("Ebeling"), who is an Administrative Specialist Senior with the Policy and Legal Services Division of the DOC, avers that she is involved in the coordination of grievance appeals within the DOC.  Id. at ¶1.  According to Ebeling, the DOC grievance procedure, as we have detailed its processes, may be used to

address nearly any issue or grievance, that concerns the conditions of confinement at a particular facility, and she further avers that King's claims are appropriate subjects for a grievance. Id. at ¶¶2-3. Ebeling attests that labeling a kite as a "grievance" does not convert the kite into a formal grievance, as contemplated by the DOC's grievance procedures. Id. at ¶2.

Ebeling avers that she has reviewed the DOC's records, and she has determined that King did not file a grievance on those issues with MCF-Stillwater, or with the DOC's Central Office, and indeed, he has filed only one (1) grievance, in December of 2008, since he was incarcerated, and that grievance pertained to a strip search that was conducted while he was incarcerated at MCF-OPH. Id. at ¶3. According to Ebeling, that grievance did not have any relationship to any of King's allegations concerning the sharing of private information by a staff person, or any conspiracy to assault him. Id. Moreover, Lisa Rudeen, who is a paralegal at MCF-Stillwater, avers that, while at MCF-Stillwater, King attempted to file only one (1) grievance on March 27, 2008, which related to discipline that he had received for refusing to move to a double-bunked cell on March 19, 2008. See, Rudeen Aff., supra at ¶¶1-3, and Exhibits A and B. However, that grievance was returned to King on March 28, 2008, because there is a separate appeal process for discipline decisions, and because he had

not attached copies of kites showing that he had tried to resolve the issues informally. Id. at ¶3 and Exhibit B.

"Courts recognize only three exceptions to the exhaustion requirement, including futility, inability of the administrative remedies to provide adequate relief, and the establishment of an agency policy or practice of general applicability that is contrary to law." Blackmon ex rel. Blackmon v. Springfield R-XII Sch. Dist., 198 F.3d 648, 656 (8th Cir. 1999), citing Urban by Urban v. Jefferson Co. Sch. Dist. R-1, 89 F.3d 720, 724 (10th Cir. 1996). "An administrative remedy will be deemed futile if there is doubt about whether the agency could grant effective relief." Ace Prop. & Cas. Insur. Co. v. Federal Crop Ins., 440 F.3d 992, 1000 (8th Cir. 2006), citing McCarthy v. Madigan, 503 U.S. 140, 147 (1992).

Here, the Defendants have submitted Affidavits, which attest to the fact that the King has filed only two (2) grievances during his incarceration, which are entirely unrelated to his current complaints. They argue that, as a consequence, King's claims should be dismissed. In response, King has not competently controverted the Defendants' attestation that he failed to exhaust his administrative remedies. Indeed, he does not so much as suggest that he followed the DOC's formal Grievance Procedure, that efforts to exhaust his remedies would have been futile, that adequate

relief was unavailable, or that the policies pertaining to his claims were contrary to law.  While King submitted several informal kites to various MCF-Stillwater staff persons, the Record before establishes that he did not file a formal grievance with respect to those claims.[8]

Those submissions are insufficient to create any genuine issue of material fact, concerning the Plaintiff's failure to exhaust his administrative remedies.  As noted,

---

[8]King has submitted copies of numerous kites, or responses to his kites, and he alleges in his Complaint, that he "appealed through prison chain-of-command to David R. Crist, Assistant Commissioner of D.O.C. Facility Services Division and to Brent Wartner Director Policy and Legal Services for D.O.C."  Complaint, supra at p. 2.  However, King's submissions show that he formally appealed the outcome of his Disciplinary Hearing, but he has not attempted to show that he either filed or attempted to file, a formal grievance with respect to his other claims. Id. at Exhibits H8-J10.  We are mindful that, in one of his kites, King appears to claim that he has been denied access to the administrative remedies process because some of his kites were apparently not returned to him.  Id. at Exhibit P16.  However, King has not alleged that he was denied access in this action, and we cannot conclude that this brief reference, in an exhibit, to an asserted obstruction of the grievance procedure is sufficient to create a genuine issue of material fact as to exhaustion.  Moreover, King has not shown that he attempted to use the formal grievance procedure, which was obstructed because he did not attach the relevant kites.  As such, any argument to this effect would likewise fail.

We note that King makes reference to Corbo's asserted retaliation in his appeal of his disciplinary proceeding.  See, Complaint, at p. 6 and Exhibit Q22.  However, at that time, he did not assert that anyone other than Corbo, had retaliated against him, or was responsible for that retaliation.  As such, this does not change the question, since exhaustion requires that the plaintiff exhaust his administrative remedies for each claim, as to each of the named Defendants.

Ebeling avers that the informal use of kites does not satisfy the requirements of the formal grievance procedure, even if an inmate labels his various kites as grievances. The inmate is still required to institute the formal grievance procedure, following a failure of the informal use of kites that are directed at staff members in order to resolve the inmate's particular issue.

In addition to being mandatory, "the PLRA exhaustion requirement requires **proper** exhaustion * * * [which] demands compliance with an agency's deadlines and other critical procedural rules." Woodford v. Ngo, supra at 90, 93[emphasis in original]. As such, an inmate's "[f]ailure to adhere to DOC's sequential grievance process after the sending of the kite to a pertinent staff member is fatal to plaintiff's suit * * * ." Roth v. Larson, 2008 WL 4527831 at *16 (D. Minn., September 30, 2008)(granting Summary Judgment, based upon a failure to exhaust, notwithstanding the plaintiff's submission of numerous kites, in view of the plaintiff's failure to file a formal grievance, and appeal); see also, Jones v. Bock, supra at 218 ("The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but **it is the prison's requirements**, and not the PLRA, that define the boundaries of proper exhaustion.")[emphasis added]; Garcia v. Scull, 2007 WL 295614 at *5 (D. N.D., January 29, 2007)("Woodford does

not allow for substantial compliance; it requires proper exhaustion."), citing <u>Woodford v. Ngo</u>, supra; <u>Wynn v. Connor</u>, 2008 WL 400699 at \*6 (D. Minn., February 11, 2008)(holding that the plaintiff had not exhausted his administrative remedies, pursuant to the PLRA, where he sent numerous kites, but never filed a formal grievance pertaining to the issues raised in that case).

Here, the Plaintiff has not competently disputed the Defendants' evidence, which demonstrates that he has failed to exhaust his administrative remedies for his claims under the First and Eighth Amendments, and under Section 1986. The DOC's Grievance Procedure is not fully exhausted until a prisoner follows all of the required steps, and obtains a final decision from the Commissioner, and the undisputed evidence demonstrates that King has failed to initiate that process, let alone complete it.

As a consequence, we recommend that his claims of Retaliation, for a Failure to Protect, and his claims under Title 42 U.S.C. §1986, be dismissed, since King failed to exhaust his administrative remedies as to those claims.

   2. <u>Claims Against Dingle In Her Official Capacity</u>.

    a. <u>Standard of Review</u>. Next, we proceed to Dingle's argument that King's claims for damages, and for retroactive equitable relief against her, in her

official capacity, are barred by the Eleventh Amendment, and the provisions of Section 1983.

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." United States Constitution, Amendment XI. For over a century, the Amendment has been understood to stand for the proposition that a non-consenting State is immune from Federal Court suits by its **own** citizens, as well as by citizens of another State. See, Kimel v. Florida Board of Regents, 528 U.S. 62, 72 (2000); Seminole Tribe of Florida v. Florida, 517 U.S. 44, 54 (1996); Hans v. Louisiana, 134 U.S. 1, 15 (1890)(such suits were "not contemplated by the constitution when establishing the judicial power of the United States").

In effect, the Eleventh Amendment immunizes from suit a "state agency or official * * * if immunity will 'protect the state treasury from liability that would have had essentially the same practical consequences as a judgment against the State itself.'" Hadley v. North Arkansas Community Technical College, 76 F.3d 1437, 1438 (8th Cir. 1996), cert. denied, 519 U.S. 1148 (1997), quoting Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 123 n. 34 (1984); see also, Regents of the

University of California v. Doe, 519 U.S. 425 (1997); Edelman v. Jordan, 415 U.S. 651 (1974); Ford Motor Co. v. Department of Treasury, 323 U.S. 459, 464 (1945), overruled on other grounds, Lapides v. Board of Regents of University System of Georgia, 535 U.S. 613, 614-15 (2002).

Over the years, the Supreme Court has fashioned a patchwork of exceptions to the Eleventh Amendment's limitation on Federal Court jurisdiction, as that doctrine was initially expressed in Hans v. Louisiana, supra. Under the doctrine of Ex parte Young, 209 U.S. 123 (1908), a Federal Court retains jurisdiction, notwithstanding the Eleventh Amendment, to direct State officials to conform their practices to the requirements of Federal law, even though such an injunction might have collateral effects upon a State Treasury.[9] See, Edelman v. Jordan, supra at 666-68; Milliken v. Bradley, 433 U.S. 267, 289 (1977). However, suits for retroactive equitable relief against State Officers, in their official capacity, are also barred by the Eleventh Amendment, insofar as the suits would require the payment of funds from a State Treasury. See, Edelman v. Jordan, supra at 667-68; Will v. Michigan Dep't of State

---

[9]In Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89 (1984), the Court held that pendent State law claims, for even prospective injunctive relief, were barred by the Eleventh Amendment and, to that extent, the doctrine in Ex parte Young was substantially narrowed.

Police, 491 U.S. 58, 71 (1989); <u>McGee v. Feneis</u>, 2009 WL 2928245 at *4 (D. Minn., September 8, 2009). Thus, the Eleventh Amendment bars actions, in Federal Court, which seek monetary damages from individual State Officers, in their official capacities, as well as State Agencies, because such lawsuits are essentially "for the recovery of money from the state." <u>Ford Motor Co. v. Department of the Treasury</u>, supra 464; see also, <u>Will v. Michigan Dep't of State Police</u>, 491 U.S. 58, 71 (1989)("[N]either a State nor its officials acting in their official capacities are 'persons' under §1983" when sued for damages.).

In an action under Title 42 U.S.C. §1983, a public servant may be sued in an official, or in an individual capacity, or both. See, <u>Johnson v. Outboard Marine Corp.</u>, 172 F.3d 531, 535 (8th Cir. 1999). A suit against a public employee in that person's official capacity is merely a suit against the public employer. <u>Id.</u>, citing <u>Kentucky v. Graham</u>, 473 U.S. 159, 165-166 (1985). The Eleventh Amendment protects the State, and the arms of the State, from liability for monetary damages in a Section 1983 action. See, <u>Hadley v. North Arkansas Community Technical College</u>, supra at 1438 (stating that a State Agency, or its officials, may invoke Eleventh Amendment immunity, if the practical result of a suit would result in a Judgment against the State itself). Such immunity also extends to State officials who are named as individual

defendants, acting in their official capacity.  Id.  When the action is against the office, and not the person, there is no difference from a suit against the State itself.  See, Hafer v. Melo, 502 U.S. 21, 25-26 (1991); Will v. Michigan Department of State Police, supra at 71.

a.  Legal Analysis.  Dingle is an employee of the DOC, and therefore, she is entitled to Eleventh Amendment immunity, because she is an official employed by the State.  See, Hadley v. North Arkansas Community Technical College, supra at 1438.  King does not allege any waiver of Eleventh Amendment immunity by Dingle, or the State, and a review of the Record does not disclose any such waiver by either.  See, Faibisch v. University of Minnesota, 304 F.3d 797, 800 (8th Cir. 2002)("To waive sovereign immunity, a state must make a clear, unequivocal statement that it wishes to do so.").

Accordingly, we find that King's request for money damages, against Dingle in her official capacity, is barred by the Eleventh Amendment.[10]

---

[10]Dingle has also argued that the Eleventh Amendment bars King's request for injunctive relief, in the nature of an expungement of the disciplinary proceeding from his disciplinary record, because it amounts to retroactive equitable relief.  We cannot conclude that such is the case here.  While Dingle is correct in noting that retroactive equitable relief is unavailable under the Eleventh Amendment, many Courts have found that an expungement, even where predicated on a past violation of the law, is
(continued...)

still, at least in some circumstances, prospective in nature, at least to the extent that it prohibits government officials from continuing to use a past violation against the plaintiff. See, e.g., Pascarella v. Swift Transportation Company, Inc., 643 F. Supp.2d 639, 648-649 (D. N.J. 2009)(finding that reinstatement of employment and driver's license, based upon a past due process violation, is appropriate prospective relief under Eleventh Amendment); Elliott v. Hinds, 786 F.2d 298, 302 (7th Cir. 1986)("The injunctive relief requested here, reinstatement and expungement of personnel records, is clearly prospective in effect and thus falls outside the prohibitions of the Eleventh Amendment," where the State wrongfully discharged employee in violation of First Amendment right to free speech.); Koslow v. Commonwealth of Pennsylvania, 302 F.3d 161, 178-79 (3d Cir. 2002), cert. denied, 537 U.S. 1232 (2003)(finding that a request for reinstatement by State officials was not barred by Eleventh Amendment); Wolfel v. Morris, 972 F.2d 712, 719 (6th Cir. 1992)(finding that expungement of disciplinary records, based upon punishment imposed in violation of First Amendment, awarded only prospective relief since, "[a]s a practical matter, the district court's order merely prevents the prison system from considering the discipline imposed in this case as part of the inmates' records in the future."); Sexton v. Arkansas Supreme Court Committee on Professional Conduct, 725 F. Supp. 1051, 1053 (W.D. Ark. 1989).

We recognize that at least one (1) case in this District has held that an expungement of a prison record is retroactive only. See, McGee v. Feneis, 2009 WL 2928245 at *5 (D. Minn., September 8, 2009)(relying on Green v. Mansour, 474 U.S. 64, 68 (1985), and holding that expungement only affects events that have happened in the past). McGee did not discuss whether any future repercussions might result from the disciplinary proceeding and, moreover, Green v. Mansour, supra, upon which McGee relied, is distinguishable from this case since, there, the only relief was "notice relief" that the State's prior conduct had violated Federal law. Here, Dingle has not put forth any evidence that would allow us to conclude that there are no future effects flowing from the disciplinary proceeding, and as such, we cannot conclude that injunctive relief, as requested by King, is barred by the Eleventh Amendment, based upon the Record before us. Nevertheless, we have concluded, as we discuss

(continued...)

3.	<u>Qualified Immunity</u>. The Defendants contend that they are entitled to qualified immunity, as to each of King's claims that are directed at them in the individual capacities, because King cannot demonstrate any violation of his constitutional rights and, in any event, since it was not reasonably clear, at the time that the events occurred, that they were violating King's rights.

a.	<u>Standard of Review</u>. Government officials, who are performing discretionary functions, are generally shielded from liability for civil damages, unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known. See, <u>Wilson v. Layne</u>, 526 U.S. 603, 609 (1999); <u>Young v. Harrison</u>, 284 F.3d 863, 866 (8th Cir. 2002); <u>Winters v. Adams</u>, 254 F.3d 758, 766 (8th Cir. 2001).

"[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in the light of the legal rules that were 'clearly

_____

[10](...continued)
elsewhere, that King is not entitled to injunctive relief, since no violation of his rights occurred as a result of the discipline imposed because of the altercation with Jones, or any other conduct that has been alleged by King.

established' at the time it was taken." Wilson v. Layne, supra at 614, quoting Anderson v. Creighton, 483 U.S. 635, 639 (1987); Parrish v. Ball, --- F.3d ---, 2010 WL 445736 at *6 (8th Cir., February 20, 2010). The contours of the constitutional right at issue "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right," but "[t]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in light of pre-existing law, the unlawfulness must be apparent." Anderson v. Creighton, supra at 640 (1987); Nelson v. Correctional Medical Services, 583 F.3d 522, 531 (8th Cir. 2009); Young v. Selk, 508 F.3d 868, 875 (8th Cir. 2007). Thus, "[t]he doctrine 'gives ample room for mistaken judgments but does not protect the plainly incompetent or those who knowingly violate the law.'" Bagby v. Brondhaver, 98 F.3d 1096, 1098 (8th Cir. 1996).

"In analyzing the officials' claim of qualified immunity we consider two questions: (1) 'whether the facts that a plaintiff has alleged or shown,' when viewed in the light most favorable to [the plaintiff] support a finding that the conduct of [the defendants] violated a constitutional right, and (2) whether that constitutional right was 'clearly established' [at the time of the alleged violation] such that a reasonable official would have known that his or her actions were unlawful." Nelson v.

Correctional Medical Services, supra at 528, quoting Pearson v. Callahan, --- U.S. ---,

129 S.Ct. 808, 815-16 (2009); see also, Howard v. Kansas City Police Dep't, 570 F.3d

984, 988 (8th Cir. 2009).

"Recently, the Supreme Court instructed that we are 'permitted to exercise [our]

sound discretion in deciding which of the two prongs of the qualified immunity

analysis should be addressed first in light of the circumstances in the particular case

at hand."   Parrish v. Ball, supra at *7, quoting Pearson v. Callahan, supra at 818.

While advising that the Saucier procedure is helpful, see, Saucier v. Katz, 533 U.S.

194 (2001), but no longer mandatory, the Supreme Court explained, as follows:

> [T]he rigid Saucier procedure comes with a price.  The
> procedure sometimes results in a substantial expenditure of
> scarce judicial resources on difficult questions that have no
> effect on the outcome of the case.  There are cases in which
> it is plain that a constitutional right is not clearly
> established but far from obvious whether in fact there is
> such a right.  District courts and courts of appeals with
> heavy caseloads are often understandably unenthusiastic
> about what may seem to be an essentially academic
> exercise.

Pearson v. Callahan, supra at 818.

As a result, where appropriate, Courts are permitted to dispose of the qualified

immunity issue on the second prong -- that is, whether a violation of a clearly

established constitutional right has occurred -- without considering the first prong of

<u>Saucier</u>. See, <u>Parrish v. Ball</u>, supra (holding that the second prong was dispositive, because the defendant's actions did not amount to a violation of a clearly established constitutional right); <u>Norman v. Schuetzle</u>, 585 F.3d 1097, 1103 (8th Cir. 2009).

        b.    <u>Legal Analysis</u>.  In the light of these legal standards, we proceed to an examination of each of King's claims.

        1.    <u>The Eighth Amendment Claim</u>.  As the Defendants have underscored, King did not expressly plead an Eighth Amendment claim, but he cited to Eighth Amendment case law in his Memorandum, and therefore, in an abundance of caution, we address whether he has advanced a viable Eighth Amendment claim.  We conclude that he has not.

    The conditions of a prisoner's confinement are clearly subject to Eighth Amendment scrutiny.  See, <u>Helling v. McKinney</u>, 509 U.S. 25, 31-32 (1993); <u>Brown v. Nix</u>, 33 F.3d 951, 954-955 (8th Cir. 1994); <u>C.H. v. Sullivan</u>, 718 F. Supp. 726, 733-734 (D. Minn. 1989), aff'd, 920 F.2d 483 (8th Cir. 1990).  Indeed, our Court of Appeals has mandated a "careful judicial scrutiny" of prison conditions.  <u>Tyler v. Black</u>, 865 F.2d 181, 184 (8th Cir. 1989), cert. denied, 490 U.S. 1027 (1989). Accordingly, it is well-settled that a prisoner's confinement must not result in a serious deprivation of his basic human needs, or of a minimal, civilized measure of

life's necessities.  See, <u>Helling v. McKinney</u>, supra at 32; <u>Estelle v. Gamble</u>, 429 U.S. 97, 102-03 (1976); see also, <u>Rhodes v. Chapman</u>, 452 U.S. 337, 347-348 (1981).  As stated, the focus is on "basic human needs -- e.g., food, clothing, shelter, medical care and reasonable safety."  <u>Helling v. McKinney</u>, supra at 32, citing <u>DeShaney v. Winnebago County Department of Social Services</u>, 489 U.S. 189, 199-200 (1989); see also, <u>Williams v. Delo</u>, 49 F.3d 442, 445 (8th Cir. 1995); <u>Brown v. Nix</u>, supra at 955. "The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones."  <u>Farmer v. Brennan</u>, 511 U.S. 825, 832 (1994) [internal quotes and citations omitted].

Prison officials violate the Eighth Amendment "only when two requirements are met."  <u>Farmer v. Brennan</u>, supra at 834.  First, the alleged deprivation must be, objectively, sufficiently serious, that is, the prison official's act, or failure to act, must have resulted in "the denial of the minimal civilized measure of life's necessities."  <u>Id.</u>, citing <u>Wilson v. Seiter</u>, 501 U.S. 294, 298 (1991), and <u>Rhodes v. Chapman</u>, supra at 347; <u>Williams v. Delo</u>, supra at 445.  Second, to be liable, a prison official "must have a sufficiently culpable state of mind," <u>id.</u>, citing <u>Wilson v. Seiter</u>, supra at 302-03, and, in cases such as this one, a subjective standard -- namely, a "deliberate indifference" to an excessive risk posed to an inmate's health and safety -- must be

satisfied before a finding of liability can attach.  Id.; see also, Revels v Vincez, 382

F.3d 870, 875 (8th Cir. 2004), cert. denied, 546 U.S. 860 (2005)("The defendant's

conduct must objectively rise to the level of a constitutional violation, by depriving

the plaintiff of the minimal civilized measure of life's necessities, [and] [t]he

defendant's conduct must also reflect a subjective state of mind evincing deliberate

indifference to the health or safety of the prisoner.")[internal citations and quotations

omitted].

"Being violently assaulted in prison is simply not 'part of the penalty that

criminal offenders pay for their offense against society.'"  Lenz v. Wade, 490 F.3d

991 (8th Cir. 2007), cert. denied, 552 U.S. 998 (2007), quoting Farmer v. Brennan,

supra at 834.  Accordingly, "[t]he Eighth Amendment imposes upon prison officials,

among other things, the duty to take reasonable measures 'to protect prisoners from

violence at the hands of other prisoners.'"  Davis v. Scott, 94 F.3d 444, 446 (8th Cir.

1996), quoting Farmer v Brennan, supra at 833; see also, Pagels v. Morrison, 335 F.3d

736, 740 (8th Cir. 2003)(an Eighth Amendment failure to protect claim requires an

inmate to show that there was a substantial risk of serious harm, and that a prison

official or officials "knew of and disregarded an excessive risk to [the inmate's]

safety."); Prater v. Dahm, 89 F.3d 538, 541 (8th Cir. 1996)(same); Tucker v. Evans,

276 F.3d 999, 1001 (8th Cir. 2002)("The Supreme Court has made it clear that the Eighth Amendment encompasses an inmate's right to be protected from harm by fellow inmates."), citing <u>Farmer v. Brennan</u>, supra at 833.

Here, King has alleged that he told Hamann that Corbo had shown Jones his kite, and that he was "concerned" that he might have problems with Jones. See, <u>Complaint</u>, supra at p. ¶10.[11] King has not alleged, nor is there any evidence to show, that King told Hamann, or anyone else, that he was at risk of violence at the hands of Jones. While it is not a requirement that an inmate suffer physical injury before a prison official can be imputed with knowledge of a threat to safety, "threats between inmates are common and do not, under all circumstances, serve to impute actual knowledge of an actual risk to harm." <u>Prater v. Dahm</u>, supra at 541.

We agree with the Defendants that King has failed to raise a genuine issue of material fact, as to his Eighth Amendment claim, because he has not established an evidentiary showing that any prison official was sufficiently aware that King was at risk of substantial harm. See, <u>Lenz v. Wade</u>, supra at 996 ("[N]either unsupported

---

[11]Notably, this allegation is contained in King's unverified Complaint, and he does not offer any additional evidence in support of the assertion, nor does he offer a sworn Affidavit to that effect. In contrast, the Defendants have offered the Affidavit of Hamann, who denies that King ever told him that Corbo showed Jones the kite, or that he was concerned about any actions by Corbo and Jones.

conjecture nor negligence regarding a substantial risk of serious harm to the inmates is sufficient to prove deliberate indifference."); Tucker v. Evans, supra ("Even if there was a substantial risk of harm to [plaintiff], there is no evidence that [the defendant] was deliberately indifferent to that risk."); cf., Prater v. Dahm, supra at 541-542 (where inmate threatened another inmate, but prison officials received an assurance that there would be no further problems, there was no Eighth Amendment violation, and finding no violation of plaintiff's clearly established constitutional rights).

Moreover, "[t]he doctrine [of qualified immunity] 'gives ample room for mistaken judgments but does not protect the plainly incompetent or those who knowingly violate the law.'" Bagby v. Brondhaver, 98 F.3d 1096, 1098 (8th Cir. 1996). Here, at worst, we would conclude that King may have established that Hamann's failure to act in response to King's vague claims, regarding Jones and Corbo, was a mistaken judgment, as to which he should be granted qualified immunity. Accordingly, we find that there has not been a violation of King's clearly established right to personal safety, since King has not established that Hamann, or any other prison official, was on notice of an "excessive risk" to his safety.

Therefore, on this Record, the Defendants are entitled to Summary Judgment on King's Eight Amendment claim, that is, to the extent that we assume that he

implicitly pled one. Cf., <u>Young v. Selk</u>, supra at 873-874 (where plaintiff told officials that he had been threatened by another inmate, that his circumstances were urgent, and that he needed to move immediately, the defendants were not entitled to Summary Judgment); see also, <u>Norman v. Schuetzle</u>, supra at 1105 ("The subjective component of the qualified immunity inquiry requires that the official knew of and disregarded an excessive risk to the inmate's safety[,] [and] [w]hile a factfinder may conclude that a prison official knew of a substantial risk from the fact that the risk was obvious, the fact remains that the prison official must still draw the inference.")[internal citations and quotations omitted].

Moreover, Section 1983 liability for an Eighth Amendment violation requires a compensable injury to be greater than de minimis. See, <u>Irving v. Dormire</u>, 519 F.3d 441, 446-448 (8th Cir. 2008)(an inmate must prove an actual injury and cannot recover for the de minimis use of force, unless repugnant to the conscience of mankind); <u>Cummings v. Malone</u>, 995 F.2d 817, 822-823 (8th Cir. 1993)(actual injury is required, but recognizing that nominal damages may be awarded); <u>Prater v. Dahm</u>, 89 F.3d 538, 541 (8th Cir. 1996); <u>White v. Holmes</u>, 21 F.3d 277, 281 (8th Cir. 1994)("While a serious injury is not necessary, some actual injury is required in order to state an Eighth Amendment violation."); <u>Seltzer v. Bey v. Delo</u>, supra (no constitutional

violation where inmate fails to demonstrate that he suffered an injury or adverse health consequence as a result of his confinement); Jones v. Shield, 207 F.3d 491, 495 (8th Cir. 2000).  Here, King does not allege, nor offer does he offer any evidence of an actual physical injury, as a result of any purported Eighth Amendment violation, and accordingly we conclude that he has not advanced an actionable Eighth Amendment violation.

Moreover, to the extent that King claims mental and emotional suffering, the PLRA requires that a prisoner suffer a physical injury before he can recover for mental or emotional suffering, and therefore, his claim cannot be sustained as a result of any mental or emotional suffering that he may claim to have suffered.  See, Smith v. Moody, 175 F.3d 1025 (8th Cir. 1999)[Table Decision](affirming dismissal of inmate's Complaint in light of inmate's failure to allege a physical injury); Siglar v. Hightower, 112 F.3d 191, 193-94 (5th Cir. 1997)(affirming a dismissal, pursuant to the PLRA ,where physical injury was merely de minimis, and had not raised excessive use of force).[12]  Accordingly, we conclude that any purported emotional or mental

---

[12]We recognize that, in some circumstances, personal humiliation, and mental anguish and suffering, are compensable under the Eighth Amendment, notwithstanding the PLRA and the actual injury requirement, when the prisoner is subjected to degrading and humiliating treatment, or the unnecessary or wanton
(continued...)

suffering he has alleged does not sustain his Eighth Amendment claim, and therefore we recommend that the Defendants be granted Summary Judgment on King's Eighth Amendment claim -- that is, to the extent that he has implicitly pled one.

2.    The Due Process Claim.    King alleges that the Defendants intentionally deprived him of procedural due process, during the disciplinary proceeding, which resulted in an one hundred and eighty (180) day segregation sentence.[13]

---

[12](...continued)
infliction of pain at the hands of prison officials. See, e.g., Cowans v. Wyrick, 862 F.2d 697, 699 (8th Cir. 1988)(noting that the Eighth Amendment prohibits the unnecessary and wanton infliction of pain). However, the cases in which emotional suffering are awarded are distinguishable, because they generally involve degrading treatment or the wanton infliction of pain. Here, King appears only to assert a failure to protect claim, as he does not allege that he was caused to endure degrading treatment, or the wanton infliction of pain. As a result, under such circumstances, and in the absence of any actual physical injury that was more than de minimis, we are compelled to conclude that the occurrence, that is alleged by King, did not rise to the level of an Eighth Amendment violation, and that King has simply failed to establish that the circumstances were serious enough to result in Eighth Amendment liability.

[13]King has intertwined his Due Process claim, with his Retaliation claim, and his Civil Rights Conspiracy claim. See, Plaintiff's Memorandum, supra at pp. 6-8. To the extent that King may assert that those other claims may also constitute a Due Process violation, we find that the Plaintiff has failed to support a contention that any of the Defendants retaliated against him, or that he was the victim of an actionable conspiracy claim, which we address elsewhere.

The Fourteenth Amendment prohibits a deprivation of life, liberty, or property, without the due process of law.  While it is true that the constitutional protections, which are encompassed by the Due Process Clause, do not abate at the time of imprisonment, see, Hudson v. Palmer, 468 U.S. 517, 539 (1984)(O'Connor, J., concurring), it is also true that "lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system."  Sandin v. Conner, 515 U.S. 472, 485 (1995), quoting Jones v. North Carolina Prisoners' Labor Union, Inc., 433 U.S. 119, 125 (1977), quoting, in turn, Price v. Johnston, 334 U.S. 266, 285 (1948).

In order to maintain an actionable procedural due process claim, an inmate must show that he has been deprived of some constitutionally protected liberty or property interest.  See, Ragan v. Lynch, 113 F.3d 875, 876 (8th Cir. 1997)("A due process claim is cognizable only if there is a recognized liberty or property interest at stake.").  In prisoner cases, a constitutionally protected liberty interest will arise only when the prisoner can show that he has suffered an "atypical and significant hardship * * * in relation to the ordinary incidents of prison life," as contemplated in Sandin v. Conner, supra at 484 (holding that disciplinary segregated confinement of an inmate falls

within expected parameters of prison life, and does not represent an "atypical and significant hardship," which would create a protected liberty interest).

Our Court of Appeals has interpreted <u>Sandin</u>, as follows:

> Sandin concluded that the inmate had no liberty interest in avoiding the disciplinary confinement in issue in that case because that confinement did not present an atypical and significant deprivation in relation to the ordinary incidents of prison life. Therefore, the Due Process Clause is not implicated despite the mandatory nature of the rules relating to the imposition of disciplinary confinement. The Court stated that there are some deprivations, and not necessarily those so severe as to independently trigger due process protection, against which states could conceivably create a liberty interest. Those are deprivations which work such major disruptions in a prisoner's environment and life that they present dramatic departures from the basic conditions and ordinary incidents of prison sentences.

<u>Moorman v. Thalacker</u>, 83 F.3d 970, 972 (8th Cir. 1996)[internal citations omitted] (holding that placing inmate in "the highest level of disciplinary detention" for fifteen (15) days, followed by 107 days of progressively less restricted disciplinary detention, was not a dramatic departure from the ordinary incidents of prison life).

Here, we are compelled to conclude that King has not established an actionable due process claim, with respect to his six (6) month segregation sentence, because he has not shown that that type of discipline is the type of dramatic departure from prison life, as is contemplated by <u>Sandin</u>.

King has not alleged that he has suffered the imposition of an extended incarceration, or the loss of good time credits, as a result of the disciplinary

proceeding, nor has he alleged that the conditions of his confinement, while in segregation, were an atypical or significant hardship. Rather, the only allegation that King has made is that he was subjected to a six (6) month segregation sentence. The Courts have consistently held that a transfer to segregated confinement, by itself, is not an "atypical and significant hardship" that would create a protected liberty interest. See, <u>Portley-el v. Brill</u>, 288 F.3d 1063, 1065 (8th Cir. 2002)("We have consistently held that administrative and disciplinary segregation are not atypical and significant hardships under Sandin."); <u>Phillips v. Norris</u>, 320 F.3d 844, 847 (8th Cir. 2003)(holding that denial of visitation, exercise privileges, and religious services during thirty-seven (37) day segregation was not an atypical, significant hardship, which would support the denial of a protected liberty interest, and stating that "[w]e have consistently held that demotion to segregation, even without cause, is not itself an atypical and significant hardship."); <u>Freitas v. Ault</u>, 109 F.3d 1335, 1338 (8th Cir. 1997)(prisoner had no constitutionally protected liberty interest in remaining in less restrictive prison environment, and therefore, was not denied due process); <u>Kennedy v. Blankenship</u>, 100 F.3d 640, 642-643 (8th Cir. 1996); <u>Wycoff v. Nichols</u>, 94 F.3d 1187, 1190 (8th Cir. 1996)(prisoner has no liberty interest in avoiding segregation); <u>Bunch v. Long</u>, 2008 WL 5082861 *4 (W.D. Mo., November 24, 2008)(twenty-two

(22) months in administrative segregation did not support a finding of an atypical or significant hardship, which would implicate the Due Process Clause); Hemphill v. Delo, 124 F.3d 208 (8th Cir. 1997)[Table Decision](four (4) days in lock-down, thirty (30) days of disciplinary segregation, and two hundred and ninety (290) days of administrative segregation, without more, was not an atypical and significant hardship);Howard v. Collins, 129 F.3d 121(8th Cir. 1997)[Table Decision](eight (8) months in administrative segregation not an atypical and significant hardship); Wilson v. Harper, 949 F. Supp. 714, 723 (S.D. Iowa 1996)(eleven (11) months in segregation, including six (6) months of punitive segregation was not a denial of a protected liberty interest).

While the imposition of segregated confinement does not alone create a liberty interest, that is not to say that the length or conditions of segregation, or such other similar conditions of confinement, never implicate the Due Process Clause.  See, Williams v. Norris, 277 Fed.Appx. 647, 648-649 (8th Cir., May 12, 2008)[unpublished per curiam](approximately twelve (12) years in administrative segregation confinement was an atypical and significant hardship, in light of the particular restrictions imposed in relation to the segregation); Heron v. Schriro, 11 Fed.Appx. 659, 661-662 (8th Cir. 2001), cert. denied, 534 U.S. 1059 (2001)(recognizing that the

District Court found that the inmate's "lengthy confinement, for more than thirteen years, in administrative segregation, resulted in an atypical and significant hardship in relation to the ordinary incidents of prison life."); <u>Wilkinson v. Austin</u>, 545 U.S. 209 (2005)(holding that an indefinite placement in supermax facility, where there was a severe limitation on human contact, including cell to cell conversation; where the cell lights were dimmed, but never turned off; where inmates remained in their cells twenty-three (23) hours per day, with exercise limited to one (1) hour per day in a small indoor room; and where inmates lost parole eligibility while at the facility, was atypical).

Here, however, we are not presented with any such circumstances. King has alleged nothing more than that he was sentenced to six (6) months in segregation and, as we have detailed, that does not, by itself, create a protected liberty interest. Moreover, King has not alleged, nor has he offered any evidence of, any additional conditions of segregation which would implicate the Due Process Clause. Accordingly, we conclude that his six (6) month stint, in segregation, did not constitute an "atypical and significant hardship" that would create a liberty interest.

Insofar as King challenges the processes that the Defendants used in imposing the segregation sentence, it is well-established that a prisoner has no Federal

constitutional liberty interest in having prison officials follow prison regulations, see, Phillips v. Norris, supra at 847, and any allegation, that the Defendants failed to follow prison regulations, does not, in and of itself, state a claim for a Due Process violation. See, Bonner v. Federal Bureau of Prisons, 196 Fed.Appx. 447, 448 (8th Cir. 2006)(prisoner failed to state constitutional claim when he did not challenge constitutionality of prison regulations, but only the manner in which the regulations were followed by prison officials); McClinton v. Arkansas Dept. of Correction, 166 Fed.Appx. 260, 260-61 ("[A]ny contention that defendants failed to follow prison policy does not by itself state a claim."), citing Kennedy v. Blankenship supra at 643 ("If [the plaintiff] has a liberty interest, it is an interest in the nature of his confinement, not an interest in the procedures by which the state believes it can best determine how he should be confined."). Accordingly, to the extent that King alleges that the Defendants violated the procedures prescribed by the prison's own rules for disciplinary proceedings, we find that the claim also fails as a matter of law.[14]

Although unclear, to the extent that King also alleges a Due Process violation, with respect to his loss of employment in the W-Shop, it is sufficient to recognize that

_____

[14]Since we have concluded that King does not have a protectible liberty interest, which would implicate Due Process, we need not address whether or not the proceedings satisfied procedural due process requirements.

the denial of prison work opportunities does not constitute an atypical and significant hardship.  See, <u>Freitas v. Ault</u>, supra at 1337-1338 (finding that the loss of prison employment did not implicate the Due Process Clause); <u>Callender v. Sioux City Residential Treatment Facility</u>, 88 F.3d 666, 669 (8th Cir. 1996)("[R]evocation of [the plaintiff's] work release program was not an atypical or significant deprivation."); <u>Kelley v. Vaughn</u>, 760 F. Supp. 161, 163  (W.D.Mo. 1991)("[T]he expectation of keeping a particular job in prison is not a property or liberty interest entitled to due process protection,"); <u>Lyon v. Farrier</u>, 727 F.2d 766 (8th Cir. 1984) , cert. denied, 469 U.S. 839 (1984).

In sum, we conclude that King has not presented a valid Due Process claim, and therefore, we recommend that the Defendants be granted Summary Judgment on his Fourteenth Amendment claim, as well.

3.  <u>Failure to Prevent Conspiracy to Violate Civil Rights</u>.

King also alleges that Hamann failed to prevent the conspiracy, between Corbo and Jones, to violate his civil rights, in violation of Title 42 U.S.C. §1986.  Section 1986 provides, in pertinent part, as follows:

> Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having

power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented.

As a result, a claim under Section 1986 is dependent upon a valid claim under Title 42 U.S.C. §1985. See, Adams v. Boy Scouts of America-Chickasaw Council, 271 F.3d 769, 774 n. 8 (8th Cir. 2001); Barstad v. Murray County, 420 F.3d 880, 887 (8th Cir. 2005); Gatlin ex rel. Estate of Gatlin v. Green, 362 F.3d 1089, 1095 (8th Cir. 2004). Here, King alleges that Corbo, and Jones, violated Section 1985 by conspiring to have King assaulted, in retaliation for the grievance he filed against Corbo.

In order to show a civil rights conspiracy under Section 1985, a plaintiff must prove: 1) that the defendants conspired, (2) with the intent to deprive the plaintiff, either directly or indirectly, of the equal protection of the laws, or equal privileges and immunities under the laws, (3) an act in furtherance of the conspiracy, and (4) that they or their property were injured, or they were deprived of exercising any right or privilege of a citizen of the United States. See, Barstad v. Murray County, supra, citing Larson v. Miller, 76 F.3d 1446, 1454 (8th Cir. 1996).

Here, King's claim must fail because there is no evidence that Jones, or Corbo, committed any act in furtherance of the conspiracy, and therefore, King's Section

1986 claim must fail, since he has failed to establish a valid Section 1985 claim, which is a prerequisite to a viable Section 1986 claim. Moreover, King has offered no evidence that the alleged conspiracy was based upon racial, or class-based, discriminatory animus, beyond his conclusory allegations to that effect. See, Jensen v. Henderson, 315 F.3d 854, 862-863 (8th Cir. 2002)("Purposeful discrimination must be established for a party to succeed on a §1985(3) claim," and concluding that the plaintiff had not offered any evidence of purposeful discrimination), citing Palesch v. Mo. Comm'n on Human Rights, 233 F.3d 560, 570 (8th Cir. 2000), for the proposition that "stating conclusory allegations that the individual defendants were out to get plaintiff based on race and gender does not state a claim;" City of Omaha Employees Betterment Ass'n v. City of Omaha, 883 F.2d 650, 653 (8th Cir. 1989) (holding that the evidence did not even remotely establish that the defendant "harbored any animus toward women," in denying a female a promotion assertedly on account of her sex). Accordingly, even viewing the evidence in the light most favorable to King, there is no genuine issue of material fact, because there is no evidence of discriminatory animus on the part of Corbo and Jones, which would support the existence of a Section 1985 conspiracy. We conclude that the mere fact that they may have

conspired to commit some wrong does not establish the requisite discriminatory animus for a Section 1985 claim.[15]

In turn, in order to maintain a Section 1986 action, a plaintiff must prove that (1) the defendant had actual knowledge of a Section 1985 conspiracy, (2) the defendant had the power to prevent or aid in the prevention of the Section 1985 conspiracy, (3) the defendant neglected or refused to prevent the conspiracy, and (4) a wrongful act was committed. See, Brandon v. Lotter, 157 F.3d 537, 539 (8th Cir. 1998), quoting Clark v. Clabaugh, 20 F.3d 1290, 1295 (3rd Cir. 1994)(firsthand knowledge is not required, but Courts nevertheless require "actual knowledge," and

---

[15]King makes a vague reference to a Section 1985 conspiracy, with respect to Defendants Oseland, Dingle, and Lindell, in the portion of his Memorandum that relates to his Due Process and First Amendment claims. See, Plaintiff's Memorandum, supra at pp. 7-8. The Defendants have not addressed those references specifically. He contends that they conspired to intentionally deprive him of his procedural due process rights, through an unlawful disciplinary proceeding. Id. However, as far as we can tell, King did not raise such a claim in his Complaint. Moreover, we find that the claim must also fail, because King has not alleged any facts that would support any inference that there was a "meeting of the minds" to deprive King of any civil right, that any civil right was violated, or that any discriminatory animus existed, which is necessary to support a Section 1985 conspiracy. See, Habhab v. Hon, 536 F.3d 963, 969 (8th Cir. 2008)(advising that "[a] conspiracy claim requires evidence of specific facts that show a 'meeting of minds' among conspirators"), quoting Barstad v. Murray County, 420 F.3d 880, 887 (8th Cir. 2005). Therefore, even if he had appropriately raised a claim under Section 1985, it would likewise fail.

finding that genuine issue of material fact existed regarding whether knowledge of rumors was sufficiently reliable to constitute actual knowledge of a civil rights conspiracy); <u>Robey v. Chester County</u>, 946 F. Supp. 333, 336 (E.D. Pa. 1996)(finding that plaintiff had not established a Section 1986 claim where there was no evidence in the Record to show that any of the defendants had knowledge of a conspiracy).

King's Section 1986 claim must also fail because he has not shown that Hamann was aware of any alleged conspiracy. While King has alleged that he told Hamann that Corbo showed his kite to another inmate, he has not alleged that he told Hamann that they were planning to assault him. To be sure, Hamann denies that King told him of a planned assault, but we conclude that the mere fact that King may have told Hamann, that Corbo showed King's kite to Jones, is insufficient to establish knowledge of a Section 1985 conspiracy. King argues that he need not show that Hamann had a specific awareness that King could be assaulted by Jones, but rather, he need only show that Hamann had knowledge of a substantial risk that King could be harmed, assaulted, or killed. See, <u>Plaintiff's Memorandum</u>, supra at p. 5.[16]

---

[16]In support of this argument, King has cited to cases addressing an Eighth and Fourteenth Amendment claimed failure to protect. See, <u>Plaintiff's Memorandum</u>, supra at p. 5, citing <u>Farmer v. Brennan</u>, 511 U.S. 825, 828 (1994)("A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the

(continued...)

However, we note that "[l]iability under Section 1986 is 'dependent on proof of actual knowledge by a defendant of the wrongful conduct.'" Brandon v. Lotter, supra at 539, quoting Owen v. City of Independence, 445 U.S. 622, 674 N. 15 (1980).  Here, there is no evidence that Hamann was aware that any wrongful conduct, which was the object of a conspiracy, was about to be committed.

Accordingly, we conclude that King's Section 1986 claim fails on numerous grounds, as we have detailed them.  Therefore, in addition to King's failure to exhaust his administrative remedies with respect to that claim, his Section 1986 claim fails on substantive grounds, since no reasonable trier of fact could conclude that either a valid Section 1985, or a valid Section 1986 claim, had been established.

4.    First Amendment Retaliation Claim.    King also alleges that the Defendants sentenced him to one hundred and eighty (180) days in

---

[16](...continued)
Eighth Amendment."); Brown v. Budz, 398 F.3d 904 (8th Cir. 2005)(to state an Eighth Amendment failure to protect claim, a plaintiff must allege that a defendant acted with deliberate indifference to a substantial risk of serious harm to the plaintiff); Velez v. Johnson, 395 F.3d 732 (7th Cir. 2005)(under the Fourteenth Amendment a plaintiff must demonstrate that the defendant was subjectively aware of a serious risk to health or safety of plaintiff, and that he acted with deliberate indifference to that risk).  We find those cases to be inapposite as to the issue of what level of knowledge is required in a Section 1986 case.  However, to the extent that King is raising an Eighth Amendment failure to protect claim, we have already addressed that issue, and have concluded that he has not demonstrated an actionable Eighth Amendment claim.

segregation, in retaliation for his filing a grievance, in which he alleged that Corbo had discriminated against him on the basis of race, when she decided to change the circumstances of his employment.  See, <u>Plaintiff's Memorandum</u>, supra at p. 6.

"To prevail on a claim of retaliation, a prisoner must show 1) he engaged in a protected expression, 2) he suffered an adverse action, and 3) the adverse action was causally related to the protected expression."  <u>Norman v. Schuetzle</u>, 585 F.3d 1097, 1118 (8th Cir. 2009), citing <u>Higdon v. Jackson</u>, 393 F.3d 1211, 1219 (11th Cir. 2004). "Conduct that retaliates against the exercise of a constitutionally protected right is actionable, even if the conduct would have been proper if motivated by a different reason."  <u>Cody v. Weber</u>, 256 F.3d 764, 771 (8th Cir. 2001), citing <u>Madewell v. Roberts</u>, 909 F.2d 1203, 1206 (8th Cir. 1990).  It is well-established that "[t]he filing of a prison grievance, like the filing of an inmate lawsuit, is protected First Amendment activity."  <u>Lewis v. Jacks</u>, 486 F.3d 1025, 1029 (8th Cir. 2007), citing <u>Dixon v. Brown</u>, 38 F.3d 379, 379 (8th Cir. 1994); <u>Norman v. Schuetzle</u>, supra at 1117; <u>Cowans v. Warren</u>, 150 F.3d 910, 911 (8th Cir. 1998); see also, <u>Sprouse v. Babcock</u>, 870  F.2d 450, 452 (8th Cir. 1989).

To avoid Summary Judgment on his retaliation claim, King "must submit 'affirmative evidence [of] a retaliatory motive.'"  <u>Lewis v. Jacks</u>, supra at 1029,

quoting <u>Wilson v. Northcutt</u>, 441 F.3d 586, 592 (8th Cir. 2006). We conclude that King has failed to sustain his burden. As we have detailed, there is no dispute that King has a constitutionally guaranteed First Amendment right to file grievances against prison staff -- free from retaliation. Nevertheless, King has failed to show that, but for a retaliatory motive related to his exercise of those rights, the actions he complains of would not have been taken.

First, as a matter of law, King's contention, that he was wrongfully disciplined, cannot support his retaliation claim. The Courts have repeatedly advised that, in the context of an allegedly retaliatory disciplinary action, "'if the discipline which the prisoner claims to have been retaliatory was in fact imposed for an actual violation of prison rules or regulations, then the prisoner's claim that the discipline was retaliatory in nature must fail.'" <u>Henderson v. Baird</u>, 29 F.3d 464, 469 (8th Cir. 1994), 515 U.S. 1145 (1995), quoting <u>Goff v. Burton</u>, 7 F.3d 734, 738 (8th Cir. 1993), cert. denied, 512 U.S. 1209 (1994); <u>Orebaugh v. Caspari</u>, 910 F.2d 526, 528 (8th Cir. 1990)(no retaliation claim can be stated when alleged retaliation arises from actual violation of prison regulations); <u>Hartsfield v. Nichols</u>, 511 F.3d 826, 829 (8th Cir. 2008).

As our Court of Appeals has explained:

> The critical inquiry "is not whether the prisoner alleges that prison officials retaliated against him for participating in

> constitutionally protected activity, but instead is whether
> the prison disciplinary committee ultimately found based
> upon some evidence that the prisoner committed the
> charged violation of the prison regulations."

Cornell v. Woods, 69 F.3d 1383, 1389 (8th Cir. 1995), quoting Henderson v. Baird, supra at 469; see also, Hartsfield v. Nichols, supra ("[A] defendant may successfully defend a retaliatory discipline claim by showing 'some evidence' the inmate actually committed a rule violation."), citing Goff v. Burton, supra at 738-739.

Here, because the Hearing Officer found -- based on **some evidence** -- that King violated several prison rules, during his altercation with Jones, King cannot prevail on his retaliatory discipline claim.  The prison did no more than punish King for acts that he was not entitled to commit, and the imposition of punishment for those wrongful acts cannot, as a matter of law, form the basis of a retaliation claim.  See, Goff v. Burton, supra at 738-739.

Other than King's bare assertion, that the Defendants were part of some conspiracy to retaliate against him for having filed a grievance, King has simply made no showing that any of the actions of the Defendants, with respect to the disciplinary proceedings, were in any way motivated by a desire to retaliate against him for filing a grievance against Corbo. "[B]are allegations of malice on the defendants' part are not enough to establish retaliation claims against them."  Shehee v. Grimes, 39 Fed.Appx. 127, 129 (6th Cir., May 3, 2002), citing Crawford-El v. Britton, 523 U.S. 574, 588 (1998).

We have considered King's allegation, that Corbo conspired to have him assaulted, in retaliation for the grievance that he filed against her. However, we find that King has shown no real connection between any retaliatory motive, on the part of Corbo, and the Defendants' decision to institute disciplinary charges against King. Notably, Corbo had nothing to do with the ultimate disciplinary proceedings against King and, indeed, upon learning of Corbo's conduct, prison officials promptly investigated Corbo, and terminated her employment.

King may labor under the misapprehension that, because he believed Corbo was planning an assault against him, in retaliation for the grievance he lodged against her, that he was justified in assaulting Jones, and that any resulting disciplinary proceeding would, thereby, be "in retaliation" for his grievance. However, that contention is without merit, and cannot sustain his retaliation claim. The mere fact that King felt he was defending against a fear of retaliation does not invalidate the subsequent disciplinary proceedings, nor does it support an inference that the disciplinary proceedings were in retaliation for King's grievance against Corbo.

Moreover, to the extent that King may be contending that the Defendants conspired to have him assaulted, in retaliation for his grievance against Corbo, such a claim must also fail. First, as we have previously detailed, King has offered no

evidence that any of the Defendants were aware of, or complicit in, the asserted conspiracy between Corbo and Jones. At most, King has alleged that Hamann was aware that Corbo showed the grievance to Jones -- a fact which Hamann has denied. Nevertheless, the fact that Hamann knew that Corbo showed the grievance to Jones would not competently establish that Hamann knew about any conspiracy to assault King. While King has conjecture and speculation, he has no supporting proof.

As a final note, we recognize that King has not established that any of the Defendants are liable for Corbo's conduct, since a supervisor is liable, under Section 1983, only if he or she "directly participates in a constitutional violation or if a failure to properly supervise and train the offending employee caused a deprivation of constitutional rights." Andrews v. Fowler, 98 F.3d 1069, 1078 (8th Cir. 1996); Ellis v. Norris, 179 F.3d 1078, 1079 (8th Cir. 1999)(stating that a prisoner must allege defendants' personal involvement in or responsibility for the constitutional violations to state a claim under Section 1983); Mark v. Nix, 983 F.2d 138, 139-140 (8th Cir. 1993). Accordingly, any claim that the Defendants are liable for Corbo's conduct, without establishing the personal involvement of each Defendant, which we have already determined has not been shown here, is insufficient as a matter of law.

Given the absence of any evidence, which would support a conclusion that King's discipline was retaliatory in nature, we recommend that Summary Judgment be granted in favor of the Defendants on this claim as well.[17]

In sum, as we have detailed, all of King's claims against the Defendants fail, and therefore, we recommend Summary Judgment in favor of the Defendants be granted.[18]

NOW, THEREFORE, It is --

RECOMMENDED:

1.      That the Plaintiff's Motion for Relief Stated in Complaint [Docket No. 32] be DENIED.

---

[17]We need address the question of equitable relief only to the extent of noting that where, as here, there is an absence of any unlawful conduct, equitable relief is not available to the complaining party.

[18]We have not addressed, in any great detail, the issue of Qualified Immunity, since King has not established that any of the named Defendants violated his rights. However, we note the Defendants have not violated King's clear established rights, and as such are also entitled to Qualified Immunity.

2.    That the Defendants' Motion to Dismiss and for Summary Judgment [Docket No. 44] be GRANTED.


Dated:   February 23, 2010                    *s/Raymond L. Erickson*
                                              Raymond L. Erickson
                                              CHIEF U.S. MAGISTRATE JUDGE


## NOTICE

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than March 9, 2010,** a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections.  Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than March 9, 2010,** unless all interested

parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.